UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LYNETTE SANDIDGE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:14-CV-0884-B |
| | § | |
| FEDERAL NATIONAL MORTGAGE | § | |
| ASSOCIATION a/k/a FANNIE MAE, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Federal National Mortgage Association a/k/a Fannie Mae's

(Fannie Mae) Motion for Summary Judgment. Doc. 46. For the following reasons, the Court

**GRANTS** Fannie Mae's Motion.[1]

## I.

## BACKGROUND[2]

This is an employment discrimination case. Defendant Fannie Mae terminated Plaintiff

Lynette Sandidge (Sandidge) from her position as a sales representative with Fannie Mae in January

2013. *See* Doc. 47, Def.'s Br. Supp. Mot. Summ. J. 1, 6 [hereinafter Def.'s Br.]; Doc. 51, Pl.'s Br.

---

[1]The Court notes that this case is inextricably tied to another case that the Court recently dismissed on summary judgment. *See Warren v. Fed. Nat'l Mortg. Ass'n*, No. 3:14-cv-3993-B, 2017 WL 1365785 (N.D. Tex. Apr. 14, 2017). The disputes arise out of the same basic set of facts, involve the same counsel, refer to the same documents and records, and ultimately warrant dismissal on the same grounds. Thus, the structure, language, citations, and even conclusion here echo those in *Warren*. That said, each plaintiff brought a separate suit with separate and distinct causes of action. So each deserves the Court's full review.

[2]The Court takes its factual account from the uncontested facts contained in the summary judgment record. Any contested fact is identified as the allegation of a particular party.

Supp. Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 2, 5 [hereinafter Pl.'s Resp.]. The reason for her termination lies at the heart of this suit. Sandidge maintains that she was fired because of her gender and age. Doc. 1-2, Pl.'s Orig. Pet. ¶¶ 4.01–5.07. Fannie Mae counters that it was because she violated company policy by engaging in an improper relationship with an outside real estate broker. *See* Doc. 47, Def.'s Br. 12–21.

By way of background, Fannie Mae is a publicly traded company created by congressional charter to support the national housing market by investing in mortgage loans. 12 U.S.C. § 1723a; Doc. 1-2, Pl.'s Orig. Pet. ¶ 3.01. Due to its mortgage investments, Fannie Mae owns real estate throughout the United States. Doc. 47, Def.'s Br. 3. More specifically, when a property secured by one of Fannie Mae's mortgage interests is foreclosed upon, Fannie Mae takes ownership of the property—a "real estate owned" (REO) property—to manage and eventually sell it. *Id.*

To facilitate the sale of REO properties, Fannie Mae employs sales representatives who work to sell the properties through licensed outside brokers in an assigned territory. *Id.* at 3–4 (citing Doc. 48-1, Def.'s App. Supp. Mot. Summ. J. 315–18 [hereinafter Def.'s App.], Ex. 23, David Box Depo.). Fannie Mae then contracts with outside brokers (REO Brokers) after a rigorous screening process to work with Fannie Mae's sales reps to assist with the maintenance and disposition of REO properties. *Id.*; Doc. 1-2, Pl.'s Orig. Pet. ¶ 3.02. As part of that screening and contracting process, sales reps can recommend to Fannie Mae's management team that particular outside real estate agents be selected as REO Brokers. Doc. 47, Def.'s Br. 5 (citing Doc. 48-1, Def.'s App. 387–88, Ex. 27, 2d Warren Depo.). If selected as brokers, then those agents receive unique passwords to access Fannie Mae's proprietary Asset-Management Network (AMN). *Id.*

The underlying facts reveal that Sandidge started working for Fannie Mae in June 1997. Doc.

1-2, Pl.'s Orig. Pet. ¶ 3.02. And at all times relevant to this case, Sandidge worked for Fannie Mae as a sales rep. *Id.* In 2009, Sandidge's assigned territories included Washington, D.C., Maryland, and Virginia. Doc. 47, Def.'s Br. 6 (citing Doc. 48-1, Def.'s App. 19–20, Ex. 1, Sandidge Depo. [hereinafter Sandidge Depo.]); *see also* Doc. 51, Pl.'s Resp. 3–4. While there, she met and worked with Jonathan Spinetto, a Virginia real estate agent and approved REO Broker for Fannie Mae's properties in the area. Doc. 47, Def.'s Br. 6 (citing Doc. 48-1, Def.'s App. 19–20, Sandidge Depo.); Doc. 51, Pl.'s Resp. 3–4.

Sandidge moved from Fannie Mae's Washington, D.C./Maryland/Virginia territory to its Utah/Montana territory in 2011. Doc. 47, Def.'s Br. 7 (citing Doc. 48-1, Def.'s App. 19–20, Sandidge Depo.); Doc. 51, Pl.'s Resp. 3. To carry out her duties there, Sandidge needed the help of local real estate agents. Doc. 51, Pl.'s Resp. 3. Sandidge claims that she received directions to double the number of agents in Montana in particular from three to six. *Id.* (citing Doc. 52., Pl.'s App. Supp. Pl.'s Resp. 3 [hereinafter Pl.'s App.], Ex. 1, Sandidge Decl. [hereinafter Sandidge Decl.]). With that in mind, Sandidge says, she requested and Fannie Mae provided a list of agents available in the area. *Id.* The list included just one potential agent, but that individual failed to pass Fannie Mae's REO Broker screening process due to licensing problems. *Id.*

Spinetto was not listed as an option. *See id.*; Doc. 47, Def.'s Br. 13. Nevertheless, Sandidge "turned to" Spinetto to identify other potential agents to recommend to Fannie Mae management as REO Brokers for the area. Doc. 51, Pl.'s Resp. 3; *see also* Doc. 47, Def.'s Br. 13. Spinetto, Sandidge maintains, had helped with similar searches in the past and agreed to do so again here. Doc. 51, Pl.'s Resp. 4. To that end, Spinetto recommended agents to Sandidge, who in turn recommended them to Fannie Mae's management to be approved as REO Brokers. *See id.*, Doc. 47, Def.'s Br. 13 (citing

Doc. 48-1., Defs.'s App. 25–26, Sandidge Depo.).

The first of those agents, Patricia Ann Shampeny, was brought on in November 2011. Doc. 47, Def.'s Br. 13 (citing Doc. 48-1, Def.'s App. 38, Sandidge Depo.). Fannie Mae says that when Shampeny's screening process stalled, Sandidge emailed Fannie Mae's management to encourage moving her application along. *Id.* (citing Doc. 48-1, Def.'s App. 89, Sandidge Depo. Ex. 8). In response, Fannie Mae claims, its vendor manager explained that he had yet to receive Shampeny's application but had received—without Sandidge's endorsement—applications from two other interested agents. *Id.* Fannie Mae goes on to say that Sandidge ignored non-Spinetto-referred agents or otherwise chose not to follow up with them in favor of agents referred by Spinetto. *Id.* at 13–14 (citing Doc. 48-1, Def.'s App. 40, 47, 54–59, Sandidge Depo.).

In all, three Spinetto-referred agents became REO Brokers on Sandidge's recommendation. *Id.* at 13 (citing Doc. 48-1, Def.'s App. 25–26, Sandidge Depo.). And Fannie Mae's summary judgment evidence, including Sandidge's deposition, indicates—and Sandidge does not seem to contest[3]—that Sandidge knew those agents were affiliated with Spinetto and had "some kind of arrangement" with him, though the details of that arrangement were unclear. *Id.* at 13, 15 (citing Doc. 48-1, Def.'s App. 25–26, 66–67, Sandidge Depo.).

According to Fannie Mae, after the Montana REO Brokers were on-boarded, Sandidge took a hands-off approach and allowed Spinetto to train the Brokers and to manage their offices. *Id.* at 13 (citing Doc. 48-1, Def.'s App. 21–22, Sandidge Depo.). In essence, says Fannie Mae, Spinetto and his own employees acted as a liaison between Sandidge and the Montana REO Brokers. *Id.* at 16

---

[3]Fannie Mae asserts that Sandidge initially denied knowing about any relationship between Spinetto and the Montana REO Brokers during its investigation of her behavior. Doc. 47, Def.'s Br. 15.

(citing Doc. 48-1, Def.'s App. 15, Sandidge Depo.). So while Sandidge nominally retained her assigned duties, such as training the REO Brokers in her territories, in effect she outsourced those responsibilities to Spinetto and his team. *Id.* at 17 (citing Doc. 48-1, Def.'s App. 27–28, Sandidge Depo.). Sandidge asserts that the relationship between her, Spinetto, and the Montana REO Brokers was proper and that arrangements like hers with Spinetto were commonplace. Doc. 51, Pl.'s Resp. 4. Fannie Mae, by contrast, argues that Sandidge violated company policy by failing to keep her relationship with Spinetto at arm's-length and that, consequently, it fired her. *See, e.g.,* Doc. 47, Def.'s Br. 12, 17.

Fannie Mae states that it employs both practical and formal safeguards as part of its internal personnel management and policies to avoid potential conflicts of interest between sales reps and REO Brokers. *Id.* at 4. As a practical control, Fannie Mae often reassigns its territories among sales reps and uses multiple REO Brokers within a given sales rep's territory. *Id.* But as a more formal measure, Fannie Mae has a Code of Conduct and personnel policy that govern, among other things, sales reps' relationships and interactions with REO Brokers. *Id.*[4] Fannie Mae states that its Code of Conduct and personnel policy are designed to prevent the existence or appearance of impropriety or conflict of interest between Fannie Mae and its REO Brokers. Doc. 47, Def.'s Br. 4 (citing Doc. 48-1, Def.'s App. 204, Ex. 19, Code of Conduct [hereinafter Code of Conduct]); *see also* Doc. 48-1, Def.'s App. 220–33, Ex. 20, Conflict of Interest Policy [hereinafter Conflict of Interest Policy]. Along

---

[4]Sandidge does not specifically challenge the contents of Fannie Mae's Code of Conduct or personnel policy but continually references Fannie Mae's "internal policy," "alleged policy," or other company policies throughout her briefing. *See* Doc. 51, Pl.'s Resp. 4–5, 13, 15–18, 21, 26. The Court therefore concludes that Sandidge does not contest the existence or contents of the policies and procedures proffered by Fannie Mae in its summary judgment evidence. Rather, she disputes whether the policies and procedures were properly applied in this case.

those lines, Fannie Mae's Code of Conduct articulates a non-exhaustive list of "Code Breakers," that is, examples of conduct that would violate the code. Doc. 47, Def.'s Br. 4 (citing Doc. 48-1, Def.'s App. 138, Ex. 13, Arrington Depo.; 204, Code of Conduct).

Listed among those examples of Code Breakers is: "Giving one Fannie Mae vendor an inappropriate advantage over other vendors." *Id.*; *see also* Doc. 48-1, Def.'s App. 213, Code of Conduct. Read in context, Fannie Mae says, that means that its employees may not engage in conduct that either: (1) gives a vendor an inappropriate advantage; or (2) appears to give a vendor an inappropriate advantage. *See* Doc. 47, Def.'s Br. 4; *see also* Doc. 51, Pl.'s Resp. 5–6, 19, 23. Fannie Mae claims that it requires all of its employees, including Sandidge when she worked there, to review the Code of Conduct annually. Doc. 47, Def.'s Br. 4 (citing Doc. 48-1, Def.'s App. 3, Sandidge Depo.). Sandidge's deposition testimony indicates—and she does not seem to contest—that she was familiar with Fannie Mae's Code of Conduct and "read over it briefly" every year. Doc. 48-1, Def.'s App. 3, Sandidge Depo.

Fannie Mae asserts that its dedicated investigations unit examines alleged violations of its Code of Conduct and personnel policies. Doc. 47, Def.'s Br. 5; *see also* Doc. 51, Pl.'s Resp. 2, 20. The investigations unit's practices are governed by Fannie Mae's Investigations Procedure and Investigations Policy (together, Investigations Practices), which, at least on paper, strive to ensure that investigations are fair, impartial, and insulated from influence by Fannie Mae's management team. Doc. 47, Def.'s Br. 6 (citing Doc. 48-1, Def.'s App. 234, Ex. 21, Investigations Procedure; 451, Ex. 34, Investigations Policy). Sandidge, as will soon become apparent, disputes that the investigation of her conduct was impartial. *See, e.g.*, Doc. 51, Pl.'s Resp. 1, 10 (arguing that Fannie Mae engaged in a sham investigation).

Fannie Mae says that once an investigation is complete, the lead investigator identifies a "directed action" to be taken as a result of the investigation's findings. Doc. 47, Def.'s Br. 6. Fannie Mae's Chief Compliance Officer then purportedly reviews the proposed directed action before it is implemented. *Id.* During that process, the proposed directed actions are often discussed with Fannie Mae's management team. *See id.* Fannie Mae maintains—but Sandidge disagrees—that those discussions are just to ensure that all pertinent information is on the table; management supposedly has no input into the selection or enactment of directed actions. *Id.*; *see also* Doc. 51, Pl.'s Resp. 15–17, 19–23.

The allegations at issue here involve former REO Brokers Spinetto and Rhyan Finch. *See* Doc. 47, Def.'s Br. 7–9; Doc. 51, Pl.'s Resp. 4–5, 8. Fannie Mae alleges that in 2012, it received an anonymous tip that one of its sales reps, Stephanie Neugent, had helped Finch to establish a referral network through which he received fees for referring REO properties to other agents. Doc. 47, Def.'s Br. 7 (citing Doc. 48-1, Def.'s App. 323–26, Ex. 23, Box Depo.). Fannie Mae says that its investigations unit looked into the complaint, determined that Neugent's conduct violated the Code of Conduct and Conflict of Interest Policy, and proposed as directed action that she be fired as a result. *Id.* (citing Doc. 48-1, Def.'s App. 142, Arrington Depo.). Management agreed and fired Neugent. *See id.*; *see also* Doc. 49, Def.'s Sealed App. Supp. Mot. Summ. J. [hereinafter Def.'s Sealed App.] 620–21, Ex. 53, Approval Memo re: Stephanie Neugent.

Fannie Mae claims that its mortgage fraud group later expanded the investigation into Finch's conduct and around the same time began investigating Spinetto on similar grounds. Doc. 47, Def.'s Br. 7–8. Fannie Mae maintains that it concluded through the investigation that Finch and Spinetto improperly: (1) accessed the AMN without Fannie Mae's authorization or approval using other

brokers' login credentials and passwords; (2) required the brokers that they worked with to split commissions as payment; and (3) masked their participation by creating false emails and phone numbers to lead Fannie Mae to believe that it was contacting other brokers when it was in fact corresponding with Finch and Spinetto. *Id.* at 8. Fannie Mae also became concerned that sales reps other than Neugent were implicated by Finch and Spinetto's behavior. *Id.* at 9.

For that reason, Fannie Mae states, its investigations unit looked into which sales reps had worked with either Finch or Spinetto. *Id.* That inquiry initially identified 12 employees but two more names later came to light through ensuing investigations. *Id.*; Doc. 51, Pl.'s Resp. 6. Finch cooperated with Fannie Mae and named sales reps who he had worked with in a list forwarded to the investigations unit. Doc. 47, Def.'s Br. 9, 9 n.8 (citing Doc. 48-1, Def.'s App. 323–26, 346–47, 399). Spinetto, by contrast, refused to provide Fannie Mae with information about the sales reps who he had worked with. *Id.* at 9 (citing Doc. 48-1, Def.'s App. 445E, Ex. 32, Spinetto Depo.).

As a result, Fannie Mae conducted its own inquiry to determine which REO or other outside brokers were affiliated with Spinetto. *Id.* (citing Doc. 48-1, Def.'s App. 323–26, Ex. 23, Box Depo.). To that end, Fannie Mae searched for common email address formats to identify Spinetto-related Brokers. *Id.* Armed with that information, Fannie Mae says, it determined which sales reps had worked with or on-boarded those Brokers, and forwarded their names to the investigations unit. *Id.* at 9–10.

Fannie Mae maintains that this inquiry brought about its investigation into Sandidge. *Id.* at 10. Vinda Milles, the last Montana REO Broker to be on-boarded on Sandidge's recommendation, had an email address format consistent with that of other Spinetto-related agents. *Id.* at 10 n.9 (citing Doc. 48-1, Def.'s App. 445–45A, Ex. 32, Spinetto Depo.). Milles, says Fannie Mae, was

affiliated with Spinetto through his company Blackhawk Consulting, LLC. *Id.* at 10. Fannie Mae claims Milles told another sales rep that she essentially dealt only with Blackhawk and, as a result, never talked to anyone at Fannie Mae. *Id.* (citing Doc. 48-1, Def.'s App. 323–26, Ex. 23, Box Depo.). In other words, says Fannie Mae, Milles worked with Spinetto's team when she should have been working directly with Sandidge. *See id.* at 8. Fannie Mae goes on that Milles stated that when Sandidge did visit the Montana REO properties, she brought Spinetto along with her. *Id.* at 10 (citing Doc. 48-1, Def.'s App. 323–26, Ex. 23, Box Depo.).

Fannie Mae says that Sandidge's direct supervisor, Christopher Cordina, learned of Milles's story and followed up with her to confirm its veracity. *Id.* (citing Doc. 48-1, Def.'s App. 168A); *see also* Doc. 51, Pl.'s Resp. 2. Sandidge, for her part, seems to contest Cordina's knowledge of Mille's claims, and states that "he was surprised and knew nothing about the investigation." Doc. 51, Pl.'s Resp. 4 (citing Doc. 52, Pl.'s App. 5, Sandidge Decl.). Nevertheless, Fannie Mae asserts that an investigation into Sandidge's behavior then began as a result of Mille's report. Doc. 47, Def.'s Br. 10 (citing Doc. 148, Def.'s App. 116–17, Ex. 13, Arrington Depo.).

Fannie Mae claims that its investigation uncovered a number of questionable or improper activities by Sandidge, including: (1) taking significant steps to ensure that Spinetto had a hand in Montana REO properties despite knowing that he was not licensed in Montana; (2) acquiescing to Spinetto's referral-based business relationship with the Montana REO Brokers; (3) permitting Spinetto to manage or at least be involved in managing the Montana REO properties, train the Montana REO Brokers, and access Fannie Mae's AMN; and, most importantly, (4) not telling anyone about it. Doc. 47, Def.'s Br. 12–17. In essence, Fannie Mae says, Sandidge outsourced her responsibilities to Spinetto and his team, who acted as liaisons between Sandidge and the Montana

REO Brokers. *Id.* at 16 (citing Doc. 48-1, Def.'s App. 15, Sandidge Depo.). So when Sandidge worked with a Montana REO Broker, she was actually working with Spinetto. *See id.* And despite, Fannie Mae maintains, signs that interplay might be improper—for instance, Sandidge's annual review of Fannie Mae's Code of Conduct or the use of special emails so that communications sent to a REO Broker would also be sent to Spinetto—Sandidge never reported it to her supervisor or other superior.[5] *Id.*

Sandidge casts these facts in a different light. Fannie Mae, Sandidge says, instructed her to double the amount of REO Brokers in Montana. Doc. 51, Pl.'s Resp. 3. So she did. *Id.* Following standard procedures, Sandidge received a list of interested agents from Fannie Mae. *Id.* But that list, Sandidge continues, included just one agent who turned out to be unqualified due to licensing issues. *Id.* Sandidge thus turned to Spinetto, someone she knew and had worked with before, to get recommendations for other agents. *Id.* Sandidge claims that asking for referrals—as well as the ensuing training—in that way was "common in the industry." *Id.* at 4. What's more, her understanding of Fannie Mae's rules and practices allowed for relationships like that between Spinetto and the Montana REO Brokers. *Id.* And Sandidge neither offered nor received payments, kickbacks, or any other benefits to or from Spinetto or the Montana REO Brokers. *Id.* Therefore, Sandidge claims, nothing was amiss and there was no conflict of interest. *Id.*

Still, Fannie Mae says that its investigations unit concluded that Sandidge's actions created

---

[5]Sandidge doesn't fully agree with Fannie Mae on this point. She maintains that she *did* tell Cordina about "every decision she had made [and] why she made it," just *after* Fannie Mae's investigations unit approached her about her actions. Doc. 1-2, Pl.'s Orig. Pet. ¶ 3.10. But as explained below, that temporal gap makes all the difference. Disclosure before investigation implies transparency; disclosure after does not. More to the point, Sandidge's whole theory here is that Fannie Mae's investigation was discriminatory. Yet post-investigation disclosure would, by definition, play no role in an investigation.

an appearance of impropriety. *See* Doc. 47, Def.'s Br. 17. Sandidge's deposition testimony, proffered by Fannie Mae, indicates that in February 2012 an agent in Montana contacted Sandidge and asked whether Fannie Mae had outsourced the disposition of its REO properties there to Spinetto. *Id.* (citing Doc. 48-1, Def.'s App. 27–28, Sandidge Depo.; 86, Sandidge Depo. Ex. 6). Fannie Mae says that Sandidge reported that email to Spinetto, but not to her supervisor or any other superior. *Id.* at 18 (citing Doc. 48-1 Def.'s App. 33–34, Sandidge Depo.).

That same month, Fannie Mae continues, its sales manager Marsha Peters reminded sales reps that they should not assign REO properties to REO Brokers without first confirming that Brokers had AMN access. *Id.* Sandidge's deposition testimony suggests that she responded by informing Peters that the newly on-boarded Montana REO Brokers were not timely receiving AMN access. *Id.* (citing Doc. 48-1, Def.'s App. 73, Sandidge Depo.). When Peters in turn requested additional evidence of the problem, Fannie Mae says and Sandidge's deposition testimony corroborates, Sandidge instead forwarded the request to Spinetto to ensure that he wouldn't turn up when Peters started digging into records. *Id.* at 19 (citing Doc. 48-1, Def.'s App. 74, Sandidge Depo.). Sandidge's deposition testimony intimates that she did so to steer Peters's focus to AMN access rather than Spinetto's involvement because she was concerned Peters might have had a vendetta against Spinetto. *Id.*; *see also* Doc. 48-1, Def.'s App. 74–75, Sandidge Depo.

Whatever her reason, Fannie Mae's investigations unit determined that Sandidge took steps to affirmatively conceal Spinetto's involvement with the Montana REO properties. *See* Doc. 47, Def.'s Br. 18–19. Fannie Mae's investigations unit also concluded—and Sandidge does not dispute—that Sandidge shared other REO Brokers' "scorecards," which appear to monitor Broker performance, and other information with Spinetto. *Id.* at 19; *see also* Doc. 51, Pl.'s Resp. 19–20.

Fannie Mae claims that Sandidge provided such information to Spinetto on demand but never inquired further as to why he wanted it or what he used it for. Doc. 47, Def.'s Br. 20.

Fannie Mae claims that based on all of those occurrences and Sandidge's failure to report them to management, the lead investigator on Sandidge's case, Leslie Arrington, determined that termination was the appropriate direct action to take. *Id.* (citing Doc. 48-1, Def.'s App. 173, Ex. 15, Arrington Decl.). Fannie Mae says that its Chief Compliance Officer Nancy Jardini then reviewed and approved the proposed directed action. *Id.* at 21.

In January 2013, Alison Roach, a member of Fannie Mae's investigations unit assigned to the investigation into Sandidge's conduct, interviewed Sandidge about her dealings with real estate agents in Montana. Doc. 1-2, Pl.'s Orig. Pet. ¶¶ 3.03–04; *see also* Doc. 47, Def.'s Br. 11. Sandidge asserts that during the interview she "was given no opportunity to build a defense or review materials, and was given no indication of what, if any, specific accusations had been made against her." Doc. 1-2, Pl.'s Orig. Pet. ¶ 3.04. The next day Sandidge told Cordina, her direct supervisor, about her interview with Roach. *Id.* ¶ 3.10. Sandidge maintains that Cordina indicated that he "was surprised and knew nothing about the investigation." *Id.*[6]

---

[6]As addressed above, the parties' stories don't align perfectly on this point. *See supra* p. 9. That said, they don't necessarily conflict, either. Fannie Mae contends that Cordina played a part in its initiating an investigation into Sandidge after he spoke with Milles to confirm her story about Sandidge's apparent outsourcing of authority to Spinetto and his team. Doc. 47, Def.'s Br. 10 (citing Doc. 48-1, Def.'s App. 168A). Fannie Mae supports its claim with an email from Cordina to Fannie Mae's management reporting his findings. *See* Doc. 48-1, Def.'s App. 168C. Sandidge, by contrast, claims that Cordina knew nothing about the investigation, and supports her claim with her own declaration. Doc. 51, Pl.'s Resp. 4 (citing Doc. 52, Pl.'s App. 5, Sandidge Decl.). Overlooking the obvious problem of Sandidge stating as fact her own impression of another individual's personal knowledge, the Court concludes that these potentially divergent story lines are compatible. Fannie Mae's evidence indicates that Cordina did make some report to a superior. Thus, he wasn't totally in the dark as to Sandidge. Yet as Fannie Mae's briefing notes, management is, by design, walled off from investigations. *See* Doc. 47, Def's Br. 6. So Cordina could have some baseline understanding of the facts but still know nothing about the investigation.

A few days later, Sandidge received a termination letter informing her that she was being fired for failing to maintain an arm's-length relationship with Spinetto. Doc. 1-2, Pl.'s Orig. Pet. ¶ 3.13. Sandidge asserts that Fannie Mae's reasons for firing her are false and pretext for illegal discrimination. *See id.* ¶¶ 4.01–5.07. Shortly after she was terminated, Sandidge says, Fannie May employee Ray Donovan obtained a list of all employees accused of dealing with Spinetto and reported them to his wife, indicating that they had been fired for receiving improper kickbacks. *Id.* ¶ 3.15. Donovan's wife works at the Federal Home Loan Mortgage Corporation (Freddie Mac), Fannie Mae's main competitor. *Id.* Sandidge claims that Donovan did this to prevent her and other Spinetto-affiliated employees from having a fair shot at gaining employment with Freddie Mac, and in so doing impugned her professional image and accused her of committing a crime. *Id.*

On that basis, Sandidge filed suit in state court against Fannie Mae and Donovan. *See* Doc. 1-2, Pl.'s Orig. Pet. She asserted the following claims: (1) gender discrimination in violation of the Texas Commission on Human Rights Act (TCHRA), Tex. Labor Code §§ 21.001 *et seq.*, against Fannie Mae; (2) age discrimination in violation of the Texas Labor Code against Fannie Mae; and (3) defamation against both Fannie Mae and Donovan. Doc. 1-2, Pl.'s Orig. Pet. ¶¶ 4.01–6.07.[7] Fannie Mae, in turn, removed the case to this Court. *See* Doc. 1, Notice of Removal. Sandidge moved to remand the case to state court, but the Court denied her motion and dismissed Sandidge's

---

[7]Sandidge's Original Petition titles her discrimination claims as follows: (1) Gender Discrimination in Violation of Texas Human Rights Act; and (2) Discrimination Because of Age in Violation of the Texas Labor Code. Doc. 1-2, Pl.'s Orig. Pet. 6, 8. The Court considers both as being raised under the TCHRA for two reasons. First, Sandidge asserts her age discrimination claim under the Texas Labor Code in general, failing to cite even a single provision on which the Court ought to rely. *Id.* at 8. Second, the TCHRA is located within the Texas Labor Code and protects against both age and gender discrimination. *See* Tex. Labor Code §§ 21.051, 21.125. What's more, Sandidge cites to TCHRA provisions to defend both claims. Doc. 51, Pl.'s Resp. 10–11 (citing *id.* § 21.051). Accordingly, the Court construes Counts One and Two in Sandidge's Original Petition as asserting gender and age discrimination claims against Fannie Mae under the TCHRA.

claims against Donovan after finding that he had been improperly joined. *See* Doc. 25, Order 7–8.

So the only claims remaining are those against Fannie Mae for gender and age discrimination under the TCHRA and defamation. Fannie Mae's Motion for Summary Judgment (Doc. 46) seeks to dismiss all three. Sandidge has responded to Fannie Mae's Motion, and Fannie Mae has replied. *See* Doc. 51, Pl.'s Resp.; Doc. 53, Def.'s Reply to Pl.'s Resp. [hereinafter Def.'s Reply]. Thus, Fannie Mae's Motion is ripe for the Court's review.

## II.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007). And a fact "is 'material' if its resolution could affect the outcome of the action." *Id.*

The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). Usually, this requires the movant to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). But if the non-movant ultimately bears the burden of proof at trial, the movant may satisfy its burden just by pointing to the absence of evidence supporting the non-movant's case. *Id.* at 322–23.

If the movant meets that burden, then it falls to the non-movant to "show with significant

probative evidence that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (internal quotation marks omitted) (citing *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)). And significant probative evidence is just that: significant. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam). "[M]etaphysical doubt as to material facts," "conclusory allegations," "unsubstantiated assertions," or a mere "scintilla of evidence" will not do. *Id.* (internal citations and quotation marks omitted). Rather, "the non-movant must go beyond the pleadings and present specific facts indicating a genuine issue for trial." *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (citing *Celotex*, 477 U.S. at 324).

To be sure, the court views evidence in the light most favorable to the non-movant when determining whether a genuine issue exists. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). Yet it need not "sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)). Simply put, the non-movant must "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim." *Id.* If it cannot, then the court must grant summary judgment. *Little*, 37 F.3d at 1076.

## III.

## ANALYSIS

A.    *Objections to Evidence*

Before analyzing Sandidge's discrimination claims, the Court must first address two evidentiary objections. First, Sandidge objects to Fannie Mae's submission of a Final Award from its

earlier arbitration efforts with Sandidge. Doc. 51, Pl.'s Resp. 25–26; *see also* Doc. 48-1, Def.'s App. 467, Ex. 37, Final Award. The Court **OVERRULES** Sandidge's objection as moot because the evidence in question is not considered in rendering this decision.

Second, Fannie Mae objects to Sandidge's submission of the declaration of Keitha Jefferson. Doc. 54, Def.'s Obj. to Pl.'s Summ. J. Evid. 1 [hereinafter Def.'s Obj.].[8] Keitha Jefferson was formerly employed by Fannie Mae as a real estate asset analyst and foreclosure specialist. *See* Doc. 52, Pl.'s App. 660, Ex. 11, Jefferson Decl. Jefferson claims that Fannie Mae improperly terminated her after a biased investigation by Arrington and another investigator named Meghan Chadsey in retaliation for Jefferson's reporting unpaid overtime hours and requesting disability accommodation. *Id.* at 661–64. Sandidge offers her declaration to challenge the trustworthiness and character of Fannie Mae's investigators, Chadsey and Arrington, as well as to support her defamation claim. *See* Doc. 55, Pl.'s Resp. to Def.'s Obj. 2–3 [hereinafter Pl.'s Obj. Resp.].

Fannie Mae argues that Jefferson's Declaration should be excluded because it is irrelevant, conclusory, hearsay, not based on personal knowledge, and improper opinion testimony. Doc. 54, Def.'s Obj. 1–4. Sandidge, by contrast, argues that Jefferson's testimony is intimately relevant in that it speaks to Fannie Mae's investigator's bad faith. Doc. 55, Pl.'s Obj. Resp. 2. Further, Sandidge continues, Jefferson's Declaration is not hearsay because it is offered in support of Sandidge's

---

[8]The Court notes that Fannie Mae's objection cites to the incorrect docket entry. More specifically, Fannie Mae errantly cites to the docket entries from *Warren*, the companion case to this dispute. But this error does not much matter here because both declarations are identical. *Compare* Doc. 52, Pl.'s App. 660–64, Ex. 11, Jefferson Decl., *with Warren v. Fed. Nat'l Mortg. Ass'n, et al.*, No. 3:14-cv-3993-B, Doc. 66, Pl.'s App. Supp. Pl.'s Resp. to Def.'s Mot. Summ. J. 527–31, Ex. 10, Jefferson Decl. The declarations are so identical, in fact, that Sandidge herself seemed not to notice Fannie Mae's misstep and instead responded as if it had objected to the declaration she submitted in this case. The Court therefore sees no reason to split hairs on what amounts only to a typographical error, and treats Fannie Mae's objection as if it had properly referenced the document in question. *See* Doc. 52, Pl.'s App. 660–64, Ex. 11, Jefferson Decl.

defamation claim to demonstrate damage to her reputation and based on party admissions by Fannie Mae's employees. *Id.* at 3–4. Nor, Sandidge says, is it improper opinion evidence because it is based on Jefferson's own experience. *See id.*

The Court agrees with Fannie Mae. To the extent that Sandidge offers Jefferson's Declaration to attack Chadsey and Arrington's credibility, the Court is unpersuaded. Credibility determinations are not allowed at the summary judgment stage. *See Baylor Cty. Hosp. Dist. v. Burwell*, 163 F. Supp. 3d 372, 377 (N.D. Tex. 2016) ("The Court cannot make a credibility determination in light of conflicting evidence or competing inferences."). Yet even if the Court were to overlook that shortcoming, Jefferson's Declaration is almost entirely unrelated to facts at hand. Jefferson was employed by Fannie Mae at the same time as Sandidge but the similarities end there—the two held different jobs, were fired for purportedly different reasons, and asserted different claims. *See* Doc. 52, Pl.'s App. 660–64, Ex. 11, Jefferson Decl. So her testimony, in addition to being replete with conclusory allegations, is irrelevant save for a single paragraph that could potentially relate to Sandidge's defamation claim:

> 6.      Warren left Fannie Mae in approximately February 2013. Shortly after her departure, I heard statements to the effect that she had been fired for improper relationships and accepting gifts from sales people in the field. I heard similar statements about former employee Lynette Sandidge. I heard these statements from Marilyn Bynum-Wilson, and she indicated she got the information from other Fannie Mae employees.

*Id.* at 661. In other words, Sandidge seeks to admit testimony from a former employee that another employee heard from other unidentified employees who allegedly "heard statements to the effect that" Sandidge had improper relationships and accepted gifts from sales people. Or more accurately, statements to that effect about Warren—the plaintiff in this dispute's companion case—and "similar

statements" about Sandidge.

Notwithstanding the restriction on credibility determinations mentioned above, evidence at the summary judgment stage is generally "subject to the same rules that govern the admissibility of evidence at trial." *Erhhardt v. Elec. & Instr. Unltd. of La.*, 220 F. Supp. 2d 649, 658 (E.D. Tex. 2002). On that basis—and as Fannie Mae notes in its Objection—the Court concludes that the above statement is hearsay. *See Wells v. Shop Rite Foods, Inc.*, 474 F.2d 838, 839–40 (5th Cir. 1973) (affirming trial court's exclusion on hearsay grounds testimony from a witness that several of the defendant's employees had heard that the plaintiff had been discharged for stealing); *Westfall v. GTE N. Inc.*, 956 F. Supp. 707, 713 (N.D. Tex. 1996) (excluding on hearsay grounds, among other things, testimony from one of the defendant's employees that she was told by another unidentified employee that the plaintiff had been discharged for "misuse of funds with a customer"); *see also* Doc. 54, Def.'s Obj. 2–3.

At bottom, most everything in Jefferson's Declaration is irrelevant to the question of whether Fannie Mae discriminated against Sandidge because of her gender or age. *See* Fed. R. Evid. 401. And the rest is either hearsay or of such slight probative value that to allow its entry would confuse the issue rather than resolve it. *See* Fed. R. Evid. 403. For those reasons, the Court **SUSTAINS** Fannie Mae's objection to Jefferson's Declaration.

B.    *Discrimination Claims*

1.    The *McDonnell Douglas* Burden Shifting Framework

As referenced, Sandidge asserts two claims against Fannie Mae under the TCHRA: gender discrimination and age discrimination.[9] The Court analyzes both under the *McDonnell Douglas* burden shifting framework.

The TCHRA prohibits employers from discharging or otherwise discriminating against employees because of, among other things, sex and age. Tex. Labor Code § 21.051. That protection parallels protections provided by Title VII of the Civil Rights Act of 1964 and other "federal anti-discrimination statutes." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633–34 (Tex. 2012)). Thus, courts apply analogous federal statutes and cases to claims under the TCHRA. *Mission Consol.*, 372 S.W.3d at 634; *see also Quintana v. Fujifilm N. Am. Corp.*, 96 F. Supp. 3d 601, 610–11 (N.D. Tex. 2015).

With that in mind, "[a] plaintiff may prove employment discrimination with either direct or circumstantial evidence." *Quintana*, 96 F. Supp. 3d at 611. Sandidge relies on circumstantial evidence.[10] So the Court analyzes her claims "under the three-step, burden-shifting analysis

_____

[9]While not included as a standalone claim, Sandidge's summary judgment briefing also mentions potential race discrimination by Fannie Mae. *See* Doc. 51, Pl.'s Resp. 5, 10 n.1. To the extent, if any, that Sandidge argues that point, the Court considers it too under the *McDonnell Douglas* framework. *See Bender v. Shulkin*, No. 3:14-cv-2595-L, 2017 WL 1156327, at *6 (N.D. Tex. Mar. 22, 2017) (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999). And with that in mind, the Court rejects Sandidge's argument on the same grounds that it rejects her argument for age and gender discrimination below.

[10]Sandidge makes no indication that she bases her claims on direct evidence of age or gender discrimination, nor can the Court locate any such evidence relied upon in the record. Indeed, Sandidge's argument in response to Fannie Mae's Motion for Summary Judgment classifies this case as one "without direct evidence," and skips right to the *McDonnell Douglas* burden shifting framework. Doc. 51, Pl.'s Resp. 11. The Court sees no reason to disagree.

embodied in the 'modified *McDonnell Douglas* approach.'" *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010) (quoting *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)).

First, the plaintiff must "establish a prima facie case of discrimination." *Id.* "'Although the precise elements of this showing will vary depending on the circumstances, the plaintiff's burden at this stage of the case is not onerous.'" *Reed*, 701 F.3d at 439 (quoting *Mission Consol.*, 372 S.W.3d at 633). Second, if the plaintiff shows a prima facie case, then "the 'burden shifts to the employer to show a legitimate, nonretaliatory reason for the adverse employment action.'" *Id.* (quoting *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011)). "This is a burden of production, not persuasion, on the employer's part, and it 'can involve no credibility assessment.'" *Bender*, 2017 WL 1078509, at *6 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Third, "[i]f the employer meets its burden, then the burden shifts back to the plaintiff to make an ultimate showing of intentional discrimination." *Reed*, 701 F.3d at 439. There are two ways in which a plaintiff might satisfy that burden:

> Under the TCHRA, to demonstrate a genuine dispute of material fact that the defendant intentionally discriminated against him, a plaintiff may show "either (1) the reason stated by the employer was a pretext for discrimination, or (2) the defendant's reason, while true, was only one reason for its conduct and discrimination is another motivating factor ('mixed motive')." *Reed*, 701 F.3d at 439–40.

*Quintana*, 96 F. Supp. 3d at 612.[11]

---

[11]The court in *Quintana*, as well as the Fifth Circuit and Texas Supreme Court, have noted that the standard at this stage for age discrimination deviates from the general parallelism between the TCHRA and federal anti-discrimination statutes. *Quintana*, 96 F. Supp. 3d at 612 n.3, 15–16. The federal Age Discrimination in Employment Act (ADEA) requires "but for" causation at the third step of the *McDonnell Douglas* analysis; under the TCHRA, however, "'a plaintiff need only show that age was a motivating factor in the defendant's decision.'" *Id.* (quoting *Reed*, 701 F.3d at 440); *see also* Tex. Labor Code § 21.125 (explaining that discrimination need only be a motivating factor in an employer's behavior to constitute an

To be sure, the three-step *McDonnel Douglas* framework shifts the "intermediate evidentiary burdens . . . back and forth" between the plaintiff and defendant. *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). Nonetheless, "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [the] plaintiff remains at all times with the plaintiff.'" *Id.*

<u>2.</u>      <u>Sandidge fails to carry her burden to make ultimate showing of intentional discrimination by Fannie Mae</u>

Both parties have assumed here that Sandidge satisfied her initial burden of establishing a prima facie case of discrimination. *See* Doc. 47, Def.'s Br. 22 n.18; Doc. 51, Pl.'s Resp. 11–12. So the Court also assumes, without deciding, that Sandidge has established a prima facie case of discrimination. The Court now turns to the second and third steps of the *McDonnell Douglas* test.

*I.      Legitimate, nondiscriminatory reason*

Fannie Mae states that its legitimate, nondiscriminatory reason for firing Sandidge is that she violated Fannie Mae's Code of Conduct and Conflict of Interest Policy. *See* Doc. 47, Def.'s Resp. 22–23. Fannie Mae submits a litany of summary judgment evidence to support that position, including: (1) Sandidge's deposition; (2) Spinettos's deposition; (3) the depositions of Fannie Mae's corporate representatives; and (4) copies of Fannie Mae's Code of Conduct and personnel policies, including its Investigations and Conflict of Interest Policies. *See* Doc. 48, Index to Def.'s App. Fannie Mae further submits detailed records of its investigations into employees, including Sandidge, who were potentially implicated by reports of Finch and Spinetto's activities. *Id.*

---

unlawful employment practice). Sandidge asserts claims only under the TCHRA, so "the ADEA's 'but for' test is inapplicable." *Quintana*, 96 F. Supp. 3d at 612 n.3.

The summary judgment evidence shows, and Sandidge does not dispute, that Sandidge worked with Spinetto, both in Fannie Mae's Washington, D.C./Maryland/Virginia and Montana territories. *See, e.g.*, Doc. 48-1, Def.'s App. 13–22, Sandidge Depo. The record further reveals that when on-boarding new REO Brokers in the Montana territory, Sandidge favored Spinetto-related agents. *Id.* at 25–26, 40, 52–59, 65–66, 76, 89. And while Sandidge appears to have never directly received payments or benefits herself, she was aware that Spinetto and the Montana REO Brokers had "some kind of arrangement" whereby Spinetto would be compensated for his role as a liaison between them and Fannie Mae. *Id.* at 15–16, 66–68. Fannie Mae's summary judgment evidence, including Sandidge's own deposition testimony, goes on to show that Sandidge more or less outsourced her duties, including training the newly on-boarded Montana REO Brokers, to Spinetto. *Id.* at 15–16, 34–36, 38–39, 60–61, 67–68, 89, 182, 445–46. Sandidge claims that she maintained an advisory role to clarify any questions that might have arisen, but no one ever took her up on the offer. *Id.* at 66–68.

As set forth above, the summary judgment record also demonstrates that Sandidge did not report those activities or otherwise convey her knowledge of them to a superior. *See supra* pp. 11–12; *see also id.* at 33–34, 72–75, 109, 180. The record further displays that another Montana real estate agent contacted Sandidge to inquire as to whether Fannie Mae had outsourced the disposition of its Montana REO properties to Spinetto—Sandidge failed to report that inquiry to her supervisor or Fannie Mae's management team but did discuss it with Spinetto. Doc. 48-1, Def.'s App. 27–29, 33–34, 86.

As referenced, Fannie Mae's investigations unit received reports about potential Code of Conduct violations by a number of its employees, including Sandidge, related to their alleged dealings

with Spinetto and Finch. Doc. 47, Def.'s Br. 9–11. The summary judgment evidence shows that Fannie Mae investigated each of the reported employees. *See* Doc. 49, Def.'s Sealed App. 505–697, Exs. 38–60, Investigation Files & Disciplinary Decisions. While Sandidge may challenge the validity or efficacy of those investigations, she does not dispute that they took place. *See* Doc. 51, Pl.'s Resp. 12–21.

Fannie Mae's summary judgment evidence also reflects that in conducting those investigations, its investigations unit cast employees into one of three potential categories: (1) where the employee did not violate the Code of Conduct or personnel policies; (2) where the employee violated the Code of Conduct or personnel policies but where there *was no evidence* that the employee took affirmative steps to conceal his or her interactions with Spinetto or Finch or Spinetto or Finch's relationship with REO Brokers from management; and (3) where the employee violated the Code of Conduct or personnel policies and there *was evidence* that the employee took affirmative steps to conceal his or her interactions with Spinetto or Finch or Spinetto or Finch's relationship with REO Brokers from management. Doc. 48-1, Def.'s App. 170–74, Ex. 15, Arrington Decl. The investigations unit recommended that Fannie Mae not discipline employees in the first category. *See id.* Employees in the second category were to be disciplined in some form depending on the specific facts but not fired. *Id.* Employees in the third category were to be fired. *Id.*

Through that investigation, Fannie Mae determined that Sandidge: (1) improperly favored Spinetto and created the impression among third-parties that Fannie Mae condoned Spinetto's practices; (2) knew that Spinetto trained the Montana REO Brokers, accessed the AMN using their access credentials, and handled day-to-day management of the properties assigned to them; (3) shared confidential broker scorecards with Spinetto without authorization or approval; and

(4) took affirmative steps to conceal Spinetto's engagement and activities from management. *Id.* at 176–88, Ex. 17, Arrington Decl. Ex. B, Pl.'s Investigations Decision; 189–90, Ex. 18, Arrington Decl. Ex. C, Request for Approval of Pl.'s Investigations Decision. Fannie Mae then fired Sandidge. *See id.* at 174, Ex. 15, Arrington Decl.

The Court concludes that Fannie Mae has satisfied its burden of producing evidence of a legitimate, nondiscriminatory reason for its decision to terminate Sandidge in that she violated company policy.

ii.     *Pretext/mixed motive*

Because Fannie Mae has met its burden of production, "'the presumption of discrimination drops out of the picture.'" *Bender*, 2017 WL 1156327, at *9 (quoting *Rogers v. Pearland Ind. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016)). Thus, Sandidge now bears the ultimate burden of showing intentional discrimination by demonstrating that Fannie Mae's proffered reason is either: (1) not true but "instead a pretext for discrimination" (pretext theory); or (2) true but "only one of the reasons for its conduct," with another being Sandidge's protected characteristics (mixed motives theory). *Reynolds v. Sovran Acquisitions, L.P.*, No. 3:14-cv-1879-D, 2015 WL 6501552, at *3 (N.D. Tex. Oct. 27, 2015), *aff'd* 650 F. App'x 178 (5th Cir. 2016).

Sandidge attacks Fannie Mae's rationale alternatively under both theories. Doc. 51, Pl.'s Resp. 12–23; *see also Smith v. Xerox Corp.*, 584 F. Supp. 2d 905, 914 (N.D. Tex. 2008) (explaining that plaintiffs are free to allege in the alternative that their cases involve pretext and mixed motives). But as referenced, the "'motivating factor' causation standard applies to all claims brought under the TCHRA—those based on pretext and mixed motives theories alike." *Quintana*, 96 F. Supp. 3d at 615–16 (citing *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001)); *see supra* note

11.

So to avoid summary judgment, Sandidge must introduce "evidence that would enable a reasonable trier of fact to find that age or [gender] was a motivating factor" for Fannie Mae's decision to terminate her. *Id.* at 615. Because regardless of theory, to carry her burden Sandidge "must rebut each nondiscriminatory or nonretaliatory reason articulated by [Fannie Mae]." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007); *see also Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015) ("An employee seeking to show pretext must rebut each discrete reason proffered by the employer."). Fannie Mae's reason here has been laid out in detail: Sandidge, in Fannie Mae's estimation, had an improper working relationship with Spinetto and purportedly concealed that relationship, as well as Spinetto's consulting-type relationship with the Montana REO Brokers, from Fannie Mae's management.

Sandidge makes eleven arguments for why Fannie Mae's rationale was mere pretext: (1) Fannie Mae deviated from its progressive discipline procedures; (2) Fannie Mae inadequately trained Sandidge; (3) Sandidge kept her direct supervisor Cordina informed about Spinetto and the Montana REO Brokers but had no duty to update Peters, Fannie Mae's sales manager; (4) Fannie Mae selectively enforced its policies; (5) Fannie Mae's management team approved of Spinetto's activities; (6) fact issues exist over the AMN access policy; (7) Fannie Mae permitted brokers to allow others to answer their phones or emails; (8) Spinetto and Finch actively promoted their services without objection from Fannie Mae's management; (9) Fannie Mae's management selected Spinetto to appear in one of Fannie Mae's commercials in Maryland; (10) sharing broker scorecard information was common practice; and (11) Fannie Mae's investigations unit conducted partial, biased investigations. Doc. 51, Pl.'s Resp. 12–21. As for mixed motive, Sandidge further asserts that

Fannie Mae unequally enforced its Code of Conduct in a discriminatory manner. *Id.* at 21–23.

Yet despite those contentions, Sandidge fails to rebut Fannie Mae's proffered nondiscriminatory rationale by offering evidence sufficient for a reasonable jury to find that gender or age played some role in her termination. *See Quintana*, 96 F. Supp. 3d at 615–18. The Court addresses each of Sandidge's arguments in turn.

   a. Fannie Mae deviated from its progressive discipline policy

Sandidge claims that Fannie Mae deviated from its progressive discipline policy when it fired her because she did not know that her conduct was improper, had no prior disciplinary record, and caused no economic damages to Fannie Mae. *See* Doc. 51, Pl.'s Resp. 12–13. But as Fannie Mae notes in its Reply, the document Sandidge points to as evidence of Fannie Mae's "progressive discipline policy" is not a progressive discipline policy at all. *See* Doc. 53, Def.'s Reply 8 (citing Doc. 52, Pl.'s App. 574).[12] Rather, it is an appendix to Fannie Mae's Investigations Procedure titled "Factors Considered by Investigations When Determining Directed Actions," and it states, in pertinent part, as follows:

> The Managing Director (or his/her designee) may consider the following criteria when determining Directed Actions. *The actual Directed Action is dependent on the specific facts and circumstances of the violation, and thus these criteria are instructive, but not determinative.* Directed Actions, in ascending order of severity, include counseling, issuance of a Memorandum of Concern, issuance of a Formal Reprimand, suspension, and termination.

Doc. 52, Pl.'s App. 748, Ex. 13, Investigations Procedure (emphasis added). In other words, the

---

[12]Fannie Mae again errantly cites to the docket entry from *Warren*, the companion case to this dispute. As with its earlier error, though, Fannie Mae's misstep amounts to just a typographical error as the two documents are identical. *Compare* Doc. 52, Pl.'s App. 748, *with Warren v. Fed. Nat'l Mortg. Ass'n, et al.*, No. 3:14-cv-3993-B, Doc. 66, Pl.'s App'x Supp. Pl.'s Resp. to Def.'s Mot. Summ. J. 574. The Court will therefore overlook Fannie Mae's mistake and consider its argument as if it had cited to the proper document. *See* Doc. 52, Pl.'s App. 748, Ex. 13, Investigations Procedure.

summary judgment record makes plain that the "progressive discipline policy" that Sandidge bases her argument on is actually just a set of permissive guidelines for Fannie Mae's investigators to consider in context with "the specific facts and circumstances of the violation." *Id.*

As set forth above, Fannie Mae's evidence shows that its investigator Arrington determined that under these circumstances, employees would be placed into one of three disciplinary categories: (1) those who didn't violate the Code of Conduct; (2) those who violated the Code of Conduct but didn't conceal it; and (3) those who violated the code of conduct and concealed it. Doc. 48-1, Def.'s App. 170–74, Ex. 15, Arrington Decl. Employees in the first category were not disciplined, those in second were disciplined but not fired, and those in the third were fired. *See id.*

Fannie Mae's investigation concluded that Sandidge fell into the third category. *Id.* at 176–88, Ex. 17, Arrington Decl. Ex. B, Pl.'s Investigations Decision; 189–90, Ex. 18, Arrington Decl. Ex. C, Request for Approval of Pl.'s Investigations Decision. And so, the record indicates, Fannie Mae fired her. *See id.* at 174, Ex. 15, Arrington Decl. Sandidge offers no evidence beyond the purported "progressive discipline policy" to contradict that chain of events or otherwise satisfy her burden to rebut Fannie Mae's proffered nondiscriminatory reason for her termination. For that reason, Sandidge's first argument, that Fannie Mae deviated from its progressive discipline policy, fails.

b.      Fannie Mae inadequately trained Sandidge

Sandidge says that Fannie Mae failed to provide "any specific training to Sandidge that her conduct was somehow inappropriate." Doc. 51, Pl.'s Resp. 13. Sandidge claims that she "was an expert in her position" and followed "established procedures" in her dealings with Spinetto. *Id.* at 14. In further support of her claim, Sandidge points to testimony from *Warren* complaining that there

was "almost no training about when assistance by a broker such [as] Finch or Spinetto to a local broker needed to be brought to the attention of a manager." *Id.* (citing Doc. 52, Pl.'s App. 195–97, Ex. 4, Peters Depo.). Thus, Sandidge continues, she was fired for doing exactly what she was trained to do. Doc. 51, Pl.'s Resp. 14–15. And that, she concludes, constitutes discrimination. *Id.*

Sandidge is right that in some instances inadequate training "could reasonably support a finding of pretext." *Jinks v. Adv. Protection Sys., Inc.*, 162 F. Supp. 2d 542, 548 n.5 (N.D. Tex. 2001). Yet she is misguided in believing that this is one of those instances because "[i]n the absence of disparate treatment, evidence of inadequate training does not by itself raise an inference of pretext." *Sydney v. ConMed Elec. Surgery*, 275 F. App'x 748, 755 (10th Cir. 2008); *see also id.*

Sandidge fails to provide sufficient credible evidence to demonstrate that she was trained or otherwise treated differently than any other Fannie Mae employee. Indeed, the crux of her argument seems to be that Fannie Mae's training was poor all around. *See* Doc. 51, Pl.'s Resp. 15 ("Stephanie Small also claimed that she didn't recall any training on what kinds of consulting arrangements were allowed under the Master Listing Agreement."). And as mentioned above, Sandidge holds herself out as an "expert in her position." *See id.* at 14. So even if Fannie Mae's training programs were subpar, she would presumably be better trained than most. In any event, Sandidge's position boils down to the claim that it was improper for Fannie Mae to fire her for doing what she thought was right, or at least what was in line with her training. Perhaps. But Sandidge needed to show more to meet her burden on this point.

Fannie Mae's decision to fire Sandidge may have been unreasonable, unfair, or even wrong. Yet Fannie Mae "is entitled to be unreasonable so long as it does not act with discriminatory animus." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002). And here, Sandidge

offers insufficient credible evidence for a reasonable jury to conclude that she was disparately treated or otherwise the victim of discriminatory animus. On that basis, the Court rejects her second argument of inadequate training. *See Quintana*, 96 F. Supp. 3d at 615–18.

c.     Sandidge kept her direct supervisor Cordina informed about Spinetto and the Montana REO Brokers but had no duty to update Peters, Fannie Mae's sales manager

Sandidge takes issue with Fannie Mae's claim that she failed to disclose her dealings with Spinetto to management. Doc. 51, Pl.'s Resp. 5–6, 15. She claims that she *did* inform her direct supervisor, Chris Cordina, about Spinetto but refrained from mentioning it to Fannie Mae's sales director, Marsha Peters, because she worried Peters had a vendetta against Spinetto. *Id.* at 15 (citing Doc. 52, Pl.'s App. 5–7, Sandidge Decl.). Sandidge cites only to her own declaration to support her claim. *See id.*

The Court is unpersuaded. In essence, Sandidge argues that she shouldn't be lumped in with the third category of employees that concealed their actions from management because she told Cordina about Spinetto. In making that point, Sandidge concedes that she affirmatively chose not to disclose her relationship with Spinetto to Peters or other members of Fannie Mae's management team. *Id.* at 5–6, 15. In other words, Sandidge's reporting up the chain started and ended with Cordina. *Id.* Yet Sandidge spoke with Cordina about Spinetto only *after* learning that she was under investigation. *See* Doc. 52, Pl.'s App. 5, Sandidge Decl. ("*The following day* I spoke with my direct manager, Christopher Cordina about the conversation with Ms. Roach. I related every decision I had made, why I made it, and the details of the phone call. Cordina indicated he was surprised, *and knew nothing about the investigation*.") (emphasis added).

As mentioned above, that temporal gap makes all the difference. *See supra* note 5. Fannie

Mae grouped employees into disciplinary categories based, quite logically, on the conduct for which they were under investigation. *See* Doc. 48-1, Def.'s App. 170–74, Ex. 15, Arrington Decl. The upshot of Sandidge's story here is that Fannie Mae's investigation into and ensuing actions against her were discriminatory. So Sandidge seems to argue that she was placed into the third, fireable category of employees despite disclosing her activities and relationship with Spinetto to management, which if true would presumably qualify her for the second category and thus show that she was treated differently.

But that doesn't hold up to closer scrutiny. Sandidge made a post-investigation disclosure to Cordina that on its face sounds more like a cautionary counter-measure than a step towards transparency. Yet even overlooking the questionable appearance of Sandidge's course of action, a post-investigation disclosure would, by definition, play no role in an investigation. Sandidge does not argue that she reported her behavior earlier and was then treated differently from other employees who did the same. Rather, she points to her after-the-fact conversation with Cordina and argues that the Court should treat it like a contemporaneous disclosure to Fannie Mae's management. The Court declines to do so and concludes that for investigative purposes, Sandidge failed to disclose to Fannie Mae's management or her supervisors—Cordina or otherwise—her dealings with Spinetto. On that basis, the Court rejects Sandidge's third argument.

d.     Fannie Mae selectively enforced its policies

Sandidge next argues that Fannie Mae selectively enforced its internal policies by firing her for violating a rarely enforced policy but declining to fire other employees who committed similar infractions. Doc. 51, Pl.'s Resp. 15–16. In essence, Sandidge alleges that Fannie Mae treated her differently from other employees who were investigated for their ties to Finch and Spinetto because

of her gender and age. Yet as Fannie Mae sets forth exhaustively in the investigation reports included with its Appendix, that was not the case. *See* Doc. 49, Def.'s Sealed App. 505–697, Exs. 38–60, Investigation Files & Disciplinary Decisions. Fannie Mae's briefing more or less captures the distribution of how it treated its employees and enforced its policies with the following table:[13]

| Name | Action Taken | Disposition of Allegation | Gender | Age as of Date of Investigations Decision |
|---|---|---|---|---|
| Linda Brooks | None | Not Viable | Female | 55 |
| Brad Eubanks | None | Not Viable | Male | 36 |
| Marsha Peters | None | Not Viable | Female | 62 |
| Samir Bibi | None | Unsubstantiated | Male | 42 |
| Terrell Jones | None | Unsubstantiated | Male | 46 |
| Delina Mwakuriga | None | Unsubstantiated | Female | 37 |
| Gina Justman | Memo of Concern | Substantiated | Female | 49 |
| Shirley Small | Formal Reprimand | Substantiated | Female | 51 |
| Brian Kapprel | Formal Reprimand and Two-Week Unpaid Suspension | Substantiated | Male | 36 |
| Stephanie Neugent | Termination | Substantiated | Female | 60 |
| Melvin Romero | Termination | Substantiated | Male | 53 |
| Lynette Sandige | Termination | Substantiated | Female | 46 |
| Stephanie Warren | Termination | Substantiated | Female | 51 |

And that treatment is consistent with the three employee classifications described by Fannie Mae's investigator Arrington in Fannie Mae's summary judgment evidence. *See* Doc. 48-1, Def.'s App. 170–74, Ex. 15, Arrington Decl. Sandidge nevertheless points to specific employees as examples of inequitable treatment. *See, e.g.*, Doc. 51, Pl.'s Resp. 15–16. Brian Kapprel, a young white male,

---

[13]The table is drawn from Doc. 47, Def.'s Br. 28. Footnote 22 on that page cites to each employee's investigation record in Fannie Mae's appendix.

dealt with Spinetto for more than a year, Sandidge claims, but he was not fired. *Id.* And Shirley Small, "an older white woman," engaged in similar conduct yet was only reprimanded. *Id.*

But each of the instances that Sandidge relies on—and there are more than two—involves facts and circumstances different from her own that could warrant different treatment under Fannie Mae's Investigations Practices. *See* Doc. 52, Pl.'s App. 748, Ex. 13, Investigations Procedure. For instance, Fannie Mae's investigations into both Kapprel and Small concluded that neither affirmatively concealed information from Fannie Mae. *See* Doc. 49, Def.'s Sealed App. 515–16, 681–82. And as set forth in Fannie Mae's summary judgment evidence, that is a key distinction—employees who violated the Code of Conduct were punished but those who concealed their violations were fired. *See* Doc. 48-1, Def.'s App. 170–74, Ex. 15, Arrington Decl. In other words, Sandidge's examples demonstrate uniform rather than selective policy enforcement by Fannie Mae.

The same goes for Sandidge's other examples: Different sets of facts and circumstances were involved. *See, e.g.*, Doc. 53, Def.'s Reply 12–14. So despite her assertions of inequity and bias, Sandidge fails to offer sufficient credible evidence to show that Fannie Mae applied its policies selectively or to otherwise rebut Fannie Mae's proffered nondiscriminatory rationale for its decision to fire her. The Court therefore rejects Sandidge's fourth argument.

### e.  Fannie Mae approved of Spinetto's actions

Sandidge next claims that Fannie Mae's management approved schemes like the one at issue here. Doc. 51, Pl.'s Resp. 16–17. In particular, Sandidge says that a Vice President at Fannie Mae, white male David Box, "gave his blessing to Spinetto's consulting services plan." *Id.* at 16 (citing Doc. 52, Pl.'s App. 665, Ex. 12, Spinetto Decl.). What's more, Sandidge continues, one of Fannie

Mae's Directors, another white man named Peter Poidomoni, worked with Spinetto to bring on new brokers in the Chicago area while he was based out of Virginia. *Id.* at 17 (citing Doc. 52, Pl.'s App. 516–18, Ex. 9, Spinetto Depo.). Those actions were materially the same as Sandidge's, yet Fannie Mae neither investigated nor punished Box or Poidomoni. *Id.* at 16–17. Thus, Sandidge concludes, Fannie Mae's actions towards her were discriminatory. *See id.*

Fannie Mae replies that its treatment of Box and Poidomoni was warranted for two reasons. Doc. 53, Def.'s Reply 12–14. First, they held different positions. Sandidge was a sales rep. Box, by contrast, is a Vice President. *Id.* at 13 (citing Doc. 52, Pl.'s App. 249, Ex. 5, Kocks Depo.). And Poidomoni is a Director. *Id.* at 12 (citing Doc. 52, Pl.'s App. 515, Ex. 9, Spinetto Depo.). Each of those jobs entails different job responsibilities and holds a different place in Fannie Mae's corporate hierarchy. *Id.* at 12–14. Second, they engaged in different conduct. *Id.* at 12–13. Box invited Spinetto to appear in a commercial and discussed a "general training" plan, but he did not conceal his relationship with Spinetto or give him an inappropriate advantage. *Id.* at 14–15 (citing Doc 52, Pl.'s App. 511–12, Spinetto Depo.). Poidomoni worked with Spinetto[14] in a similarly transparent fashion, Fannie Mae says. *Id.* at 12–13. In short, Fannie Mae concludes, this is not the same conduct that Sandidge engaged in, so her situation cannot be compared to theirs. *Id.*

The Court agrees with Fannie Mae: Different sets of facts and circumstances were involved here, thus different responses were reasonable. Sandidge again seems to challenge the fairness of Fannie Mae's decision—her behavior, she believes, wasn't severe enough to justify firing her. But as

---

[14]Fannie Mae also contests the evidence on which Sandidge rests her claims about Poidomoni's activities. As explained above, the Court cannot weigh credibility at this stage. But that does not matter here. Even assuming Poidomoni did what Sandidge alleged, the positions and behavior are sufficiently different to warrant Fannie Mae's differing responses.

previously established, Fannie Mae is entitled to make irrational or unfair decisions so long as they are not discriminatory. *Sandstad*, 309 F.3d at 899. And Sandidge has yet to point to another employee who was similarly situated—with regard to both position and conduct—that was treated differently, not to mention on the basis of some protected class. *See Nelson v. Lowe's Home Ctrs., Inc.*, No. 3:11-cv-1497-B, 2012 WL 3731092, at *3 (N.D. Tex. Aug. 29, 2012) (explaining that an employee is similarly situated when both employees are similarly positioned in company hierarchy and participate in nearly identical conduct). Thus, Sandidge's fifth argument fails.

f.     Fact issues exist on AMN access policy

Sandidge argues that there is a question of fact over what the commonly followed policy on AMN access by REO Brokers and their assistants was at the time she was fired. Doc. 51, Pl.'s Resp. 17–18. Here, too, Sandidge misses the mark. Even assuming that she is right on this point, that line of reasoning circles back to what looks to be the thrust of her case: She didn't deserve to be fired. Again, however, the Court's charge is not to second-guess Fannie Mae's personnel decisions; rather it is to determine whether Sandidge was discriminated against on account of her gender or age. *Sandstad*, 309 F.3d at 899. And the summary judgement record indicates that she was not.

Sandidge continually attacks Fannie Mae's decision as a poor one, yet she needs to provide sufficient credible evidence to support a jury finding that it was a discriminatory one. As encapsulated by the table above, she has not. *See Quintana*, 96 F. Supp. 3d at 615–18. For that reason, the Court rejects her sixth argument.

g.      Fannie Mae permitted brokers to allow others to answer their phones
        and emails

Sandidge claims that Fannie Mae's sales manager Peters had no problem with brokers having "someone else answer their phone or email," permitted brokers to hire receptionists or employ answering services, and allowed "that such a move wouldn't require approval from the sales representative." Doc. 51, Pl.'s Resp. 18–19 (citing Doc. 52, Pl.'s App. 186, Ex. 4, Peters Depo.).

The Court struggles to see how this is at all relevant here, and Sandidge makes no mention of how it ties into her larger argument—indeed, this entire section of her brief is just two sentences long. *Id.* Taking her briefing as a whole, however, the Court presumes that she intended to make the following argument: REO Brokers didn't always answer their own messages, so the Montana REO Brokers' setup with Spinetto whereby he could access their communications with Fannie Mae as some sort of liaison was not out of the ordinary.

The Court is not persuaded. Allowing a REO Broker to hire a secretary is not at all the same as allowing a REO Broker to, in effect, skirt Fannie Mae's REO chain of command. Once more, Sandidge fails to provide credible "evidence that would enable a reasonable trier of fact to find that age or [gender] was a motivating factor" for Fannie Mae's decision to terminate her. *See Quintana*, 96 F. Supp. 3d at 615.

h.      Spinetto and Finch promoted their work with Fannie Mae's blessing

Sandidge next asserts that rather than concealing their actions, Spinetto and Finch actively promoted them with Fannie Mae's management. Doc. 51, Pl.'s Resp. 19 (citing Doc. 52, Pl.'s App. 298, Ex. 6, Finch Depo.). Sandidge claims that Finch spoke to Fannie Mae's sales manager Peters about assisting other brokers and that "she apparently had no problem with it." *Id.* (citing Doc. 52,

Pl.'s App. 300, Ex. 6, Finch Depo.). But as Fannie Mae notes in its Reply, the evidence Sandidge

points to in support of that claim, Finch's deposition, does not much support it. Doc. 51, Def.'s Reply

15–16. Finch states that he met with Peters in April 2011 and explained that some emails sent to

other brokers would also be sent to him. The testimony continues, in pertinent part:

> Q.     What did you tell Ms. Peters about the kinds of assistance that you were
>         providing to the rural Fannie Mae workers?
>
> A.      I – man, I – I don't – I don't remember. I'm trying to think of if any of that
>         was talked about. I don't know how much of the rural things – I guess I kind
>         of left that type of discussion to be with the rep. I – mine was more of a – I
>         mean, literally, she wrote down what the broker's name, you know, and where
>         is the name of the company. So it was like Gary Duda, Re/Max Action; you
>         know, Jerry Richards, Re/Max Capital; Danny Gettier, Re/Max One. Well,
>         maybe it was Re/Max First. So, anyway, she knew that way. It was really just
>         a five-minute conversation. It was an improv meeting because she just
>         happened to be there.

Doc. 52, Pl.'s App. 300, Ex. 6, Finch Depo. So while Finch might have mentioned his emails to

Peters, there does not seem to be any indication that Peters knew about his assistance to REO

Brokers, let alone approved of it. Peters's own testimony, cited to by Fannie Mae, supports that

conclusion. *See* Doc. 53, Def.'s Reply 16 (citing Doc. 52, Pl.'s App. 190, Ex. 4, Peters Depo.).

Sandidge continues to say that "Spinetto actually opened a booth at a local trade fare [sic]

frequented by Fannie Mae managers and employees." Doc. 51, Pl.'s Resp. 19 (citing Doc. 52, Pl.'s

App. 520, Ex. 9, Spinetto Depo.). The Court struggles to see how attending the same trade fair

translates to "blessing" the consultant-type outsourcing that occurred here. But more to the point,

none of Sandidge's offerings go towards her burden of proving discriminatory animus.

Fannie Mae, as its summary judgment evidence shows, fired similarly situated employees of

different ages and genders because they concealed their involvement with Finch or Spinetto. If the

Court were to accept Sandidge's claim on this point—which it does not—then it would support the proposition that none of the employees that were fired should have been. In other words, Sandidge again attacks the prudence of Fannie Mae's decision rather than satisfying her burden to show that it was discriminatory. And thus her seventh argument fails. *See Quintana*, 96 F. Supp. 3d at 615–18.

I.       Spinetto appeared in a commercial for Fannie Mae

For her ninth argument, Sandidge points out that Box, Fannie Mae's white Vice President, selected Spinetto to appear in a commercial. Doc. 51, Pl.'s Resp. 19 (citing Doc. 52, Pl.'s App. 509–10, Ex. 9, Spinetto Depo.). That, she says, is tantamount to an endorsement and surely gave Spinetto some improper advantage, yet Box was never investigated. *Id.* As explained above, however, Box's actions involved different facts and circumstances than Sandidge's. So her ninth argument fails for the same reason as her fifth. *See Sandstad*, 309 F.3d at 899.

j.       Sharing broker scorecard information was common practice

Next, Sandidge asserts that it "was common to share broker scorecard information." Doc. 51, Pl.'s Resp. 20 (citing Doc. 52, Pl.'s App. 7, Sandidge Decl.). Fannie Mae, Sandidge continues, encourages "disclosure of the information to brokers, as a tool to encourage their improvement." *Id.* What's more, she goes on, numerous other employees have provided the same information to Spinetto. *Id.* (citing Doc. 52, Pl.'s App. 667, Ex. 12, Spinetto Decl.).

Fannie Mae counters that release of broker scorecard information was not common and, even if it were, would still be improper. Doc. 53, Def.'s Reply 4–5. Fannie Mae also challenges the evidence upon which Sandidge bases her claim that Spinetto received scorecard information from numerous other employees. *Id.* at 4 n.2. The excerpt in question from Spinetto's declaration reads:

15.       I periodically received information from several Fannie Mae employees about

> the performance of certain brokers, including brokers who were using the
> services of Blackhawk. Some of this information came from young, white males
> at Fannie Mae.

Doc. 52, Pl.'s App. 667, Ex. 12, Spinetto Decl. ¶ 15.

As Fannie Mae notes in its briefing, information about performance is not necessarily broker scorecard information. Doc. 53, Def.'s Reply 4 n.2. So it hardly follows that the practice of sharing broker scorecards was commonplace. *See id.* Again, however, the larger problem with Sandidge's claim here is that it in no way goes towards her burden of showing discriminatory animus. *See Quintana*, 96 F. Supp. 3d at 615–18. For that reason, the Court rejects Sandidge's tenth argument.

> k.      Fannie Mae's investigations unit conducted partial, biased
>         investigations

Sandidge next argues that Fannie Mae's investigators, Chadsey and Arrington, were partial and deliberately ignored evidence to justify their results. Doc. 51, Pl.'s Resp. 20–21. Sandidge asserts that Chadsey and Arrington ignored evidence of similar behavior by "white male employees" Brian Kapprel and Peter Poidomani. *Id.* To support her claim, Sandidge: (1) claims that she herself disclosed other employees' behavior to Fannie Mae's management that went unpunished; (2) cites to Stephanie Warren as further proof of partiality; and (3) points to Keitha Jefferson's testimony to show that Chadsey and Arrington "have poor reputations for truthfulness." *Id.*

As to Sandidge's first point, the Court has already addressed why Fannie Mae's treatment of Kapprel, Poidomoni, and Box does not support a finding of pretext. Different facts and circumstances were involved in each of the alleged instances of dissonant treatment. *See supra* pp. 30–32. The table above shows that there was no pattern of partiality or mistreatment; the detailed investigations reports included with it demonstrate the differences of fact and circumstance that warranted unique

responses. *See supra* p. 31.

Turning to Sandidge's second point, the Court previously found Warren's testimony on Fannie Mae's allegedly partial investigation unreliable. *See Warren*, 2017 WL 1365785, at *8–10. In short, the Court concluded that Warren submitted a sham declaration that contradicted her earlier testimony in an attempt to create a fact issue sufficient to survive Fannie Mae's motion for summary judgment. *Id.* at *10. On that basis, the Court excluded Warren's testimony from the record. Sandidge asserts, based on the same reasoning and evidence that Warren relied on in her own case, that Fannie Mae's investigation into Warren was partial. *Compare* Doc. 51, Pl.'s Resp. 20–21, *with id.* at *8–10. The Court disagrees for the same reasons set out in its earlier opinion, and accordingly rejects Sandidge's second argument. *See Warren*, 2017 WL 1365785, at *8–10.

As to Sandidge's final point, the Court has stricken Jefferson's declaration as irrelevant. *See supra* pp. 16–18. So while Sandidge claims that Fannie Mae's investigators were "attack dogs" who conducted biased investigations and "wore blinders as to everyone else," she offers no credible evidence to support that claim. The Court therefore rejects her eleventh argument. *See Quintana*, 96 F. Supp. 3d at 615–18.

l.   Fannie Mae's purported disparate treatment of its employees demonstrates that age and gender were motivating factors in its decision making process

Finally, Sandidge argues that Fannie Mae treated its employees differently based on their age and gender. Doc. 51, Pl.'s Resp. 21–23. That, she says, is evidence of an unlawful motivating factor. *Id.* To support that claim, Sandidge summarizes all of the examples that she pointed to as evidence of pretext. *See id.*

As referenced, to show mixed motive Sandidge must present "evidence that would enable

a reasonable trier of fact to find that age or [gender] was a motivating factor" in Fannie Mae's decision to terminate her. *See Quintana*, 96 F. Supp. 3d at 615. And as the Court has made plain a number of times now, she has not. The summary judgment record indicates that Fannie Mae treated its employees equitably, regardless of age or gender. The table provided by Fannie Mae, and included above, both summarizes and illustrates Fannie Mae's evidentiary offering. Sandidge, for her part, has failed to meet her burden to rebut that evidence.

At bottom, it seems Sandidge believes that Fannie Mae fired her for a bogus reason. Maybe. Yet "[e]mployment discrimination laws are 'not intended to be a vehicle for judicial second-guessing of business decisions, nor to transform courts into personnel managers.'" *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (quoting *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507–08 (5th Cir. 1988)). With that in mind, "[m]anagement does not have to make the proper decisions, only non-discriminatory ones." *Id.*

Fannie Mae offered ample evidence to support its nondiscriminatory reason for firing Sandidge. Sandidge failed to provide sufficient proof to rebut Fannie Mae's proffered rationale. *See Smith v. Hewlett-Packard Co.*, 512 F. Supp. 2d 587, 602 (N.D. Tex. 2007) ("Assuming [plaintiff] has somehow raised a genuine issue of fact concerning pretext, it is a weak issue of fact and there was abundant and uncontroverted evidence that no discrimination occurred."). For that reason, the Court **GRANTS** Fannie Mae's Motion for Summary Judgment on Sandidge's claims for gender and age discrimination under the TCHRA. *See Reeves*, 530 U.S. at 148 ("For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reasons was untrue and there was abundant and uncontroverted

independent evidence that no discrimination had occurred.").

C.     *Defamation Claim*

Finally, the Court turns to Sandidge's defamation claim. Fannie Mae argues that Sandidge's defamation claim should be dismissed because she fails to identify a defamatory statement and relies on deficient evidence. Doc. 53, Def.'s Reply 16–18. To the extent Sandidge does assert a defamation claim, Fannie Mae goes on, it is precluded under Texas law by qualified privilege. *Id.* at 18.

To allege a defamation claim under Texas law, a plaintiff "must show that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement." *Jones v. Performance Serv. Integrity*, 492 F. Supp. 2d 590, 594 (N.D. Tex. 2007) (citing *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)). Sandidge alleges two instances of defamation here. The Court addresses each in turn.

First, Sandidge says that Fannie Mae internally defamed her by falsely accusing her of violating the Code of Conduct and accepting kickbacks. Doc. 1-2, Pl.'s Orig. Pet. ¶ 6.02. Sandidge argues that the "gist of the internal report prepared by investigations was false" and made by Arrington and Roach while acting in the scope of their duties, so it must be defamatory. Doc. 51, Pl.'s Resp. 24–25. The Court finds a number of problems with that position.

For starters, Fannie Mae's internal reports don't accuse Sandidge of accepting kickbacks. To the contrary, they absolve her of any such allegations:

> **Decision:** While *we found no evidence that Sandidge had accepted gifts or other benefits from the RE Broker* and no evidence of a personal relationship between the RE Broker and Sandidge, we found that the evidence showed that Sandidge engaged in conduct

that created the appearance of a conflict between her personal interests and business interests.

Doc. 48-1, Def.'s App. 190, Ex. 18, Arrington Decl. Ex. C, Request for Approval of Pl.'s Investigations Decision (emphasis added). So the only allegation remaining as to Fannie Mae's purported internal defamation is that Roach and Arrington falsely accused Sandidge of violating Fannie Mae's Code of Conduct.

As should be apparent by this point, the Court concludes that Sandidge's actions, however well-intentioned, violated Fannie Mae's Code of Conduct and personnel policies. With that in mind, Arrington and Roach's internal reports claiming that Sandidge violated the Code of Conduct cannot form the basis of a defamation claim. *See Dick v. J.B. Hunt Trans., Inc.*, 772 F. Supp. 2d 806, 823 (N.D. Tex. 2011) ("Truth is a complete defense to defamation."). But even if the Court were to overlook the veracity of Arrington and Roach's reports, Sandidge's argument would still fall short.

"In Texas, an employer is protected from liability for defamation by a qualified privilege 'that attaches to communications made in the course of an investigation following a report of wrongdoing and it remains intact as long as communications pass only to persons having an interest or duty to which the communications relate.'" *Jackson v. Dall. Cty. Juvenile Dep't*, 288 F. App'x 909, 912 (5th Cir. 2008) (quoting *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995)). Fannie Mae has asserted that privilege here. *See* Doc. 47, Def.'s Br. 18. To overcome it, Sandidge must show by clear and convincing evidence that "the statement was made with actual malice. 'In the defamation context, a statement is made with actual malice when the statement is made with knowledge of its falsity or with reckless disregard to its truth.'" *Jackson*, 288 F. App'x at 912–13 (quoting *Randall's Food Mkts.*, 891 S.W.2d at 646) (internal citations omitted).

Sandidge has not met that burden. While she does allege that the reports in question were divulged to persons without an interest or duty in the matter to which they related, as addressed below, she provides no credible evidence to demonstrate that actually happened. *See* Doc 51, Pl.'s Resp. 24–25. Beyond that, Sandidge merely reasserts the same evidence offered in support of her discrimination claims to prop up her position that Fannie Mae internally defamed her. *Id.* The Court has already explained at length why that evidence misses the mark and declines to do so again here. At any rate, it falls well below the clear and convincing showing that Sandidge needed to rebut Fannie Mae's privilege. For that reason, the Court rejects Sandidge's first defamation argument.

Turning to the second, Sandidge says that Ray Donovan externally defamed her by mentioning alleged kickbacks from Spinetto to his wife, who then purportedly repeated them on the job at Freddie Mac to prevent Sandidge from gaining employment there. Doc. 1-2, Pl.'s Orig. Pet. ¶ 6.02. Sandidge offers the following evidence in support: (1) Warren's Declaration as to Ray Donovan's actions; (2) Keitha Jefferson's Declaration; and (3) the deposition testimony of Dave Wendling, another Fannie Mae employee. *See* Doc. 51, Pl.'s Resp. 24–25.

As addressed above, the Court has already dismissed Sandidge's defamation claim against Donovan, concluding that there was "no reasonable basis for Sandidge to recover on her defamation claim against [him] because of Warren's admission" that no defamatory statement was made. Doc. 25, Order 7–8. Despite that conclusion, however, Sandidge still offers Warren's Declaration to support her defamation claim against Fannie Mae. Doc. 51, Pl.'s Resp. 24. It says, in pertinent part:

> Shortly before my termination, I learned from Small, who was employed by Fannie Mae at the time, that Ray Donovan, another Fannie Mae employee, had received a request from his wife for the names of all the Fannie Mae employees who had been fired for allegedly taking kickbacks. Ms. Donovan wanted the list so that she could make sure that none would be hired by Freddie Mac, where she worked. Small

provided the information as to that time, and I believe that information as well as my name were later provided to Donovan, and through him to his wife at Freddie Mac. I am not sure how long after my initial conversation with Small in later January or early February 2013 it was before my name was passed on to Freddie Mac.

Doc. 52, Pl.'s App. 119, Ex. 2, Warren Decl.

Nothing in that testimony shows or even suggests that a defamatory statement was published. *See Jones*, 492 F. Supp. 2d at 594. Instead, it offers a few sentences replete with conclusory allegations that, if taken as true, would require the Court to parse out a defamation claim from Warren's subjective belief that some reports were at some time given to Donovan, who at some time passed them to his wife, who then at some later time shared the report with her coworkers. The Court declines to do so. *See Westfall*, 956 F. Supp. at 713. Sandidge has failed to offer credible evidence to change the Court's earlier impression of Warren's testimony. And so for the same reasons set forth in its earlier Order, the Court find's Warren's declaration unpersuasive here. *See* Doc. 25, Order 7–8.

The Court is similarly unpersuaded by Sandidge's other evidentiary offerings on this point. Keitha Jefferson's declaration was stricken above and therefore will not be considered. *See supra* pp. 16–18. That leaves Dave Wendling's deposition testimony as Sandidge's final offer of proof in support of her defamation claim. *See* Doc. 51, Pl.'s Resp. 24–25. As with Warren's declaration, the Court found in its previous Order that "Sandidge . . . acknowledged that Wendling never told her that he had heard she was terminated for receiving kickbacks." Doc. 25, Order 8.

That alone is likely sufficient to undermine Sandidge's argument. Out of an abundance of caution, however, the Court also considers the portion of Wendling's arbitration testimony that Sandidge claims describes the impact of the allegations against her. Doc. 51, Pl.'s Resp. 24 (citing Doc. 52, Pl.'s App. 830–34, Ex. 18, Wendling Arb. Test.). It includes excerpts such as:

Q. Does this refresh your recollection as to what specific rumor you heard about Ms. Sandidge?

A. It does not help reflect the specific rumor. It does help recall general rumors regarding what happened to people at Fannie Mae being let go.

Q. What rumor did you hear?

A. There were rumors regarding relationship – the people being let go having relationships with vendors.

Q. What kind of relationships with vendors?

A. In particular the articles in the news regarding the employee on the West Coast with money being involved, kickbacks. There were news articles on that situation.

Q. So did someone tell you that the people that were being fired from Fannie Mae were being fired for taking kickbacks?

A. No one said those words specifically. But there were rumors and hearsay around relationships with vendors.

Q. From whom did you hear the rumors or hearsay?

A. Most of the information came from a previous Freddie Mac employee who had been gone a long time.

Q. And who was that?

A. Marilyn Sanders.

Q. And what specifically did Marilyn Sanders tell you? What can you relate?

A. I have to say this, it's hard to recall the exact words back at that moment in time, but it was all regarding vendor relationships.

Q. Did Ms. Sanders indicate to you where she had heard the rumors from?

A. No.

Doc. 52, Pl.'s App. 830–31, Ex. 18, Wendling Arb. Test.

That testimony, far from the smoking gun that Sandidge holds it out to be, qualifies the basis of Wendling's knowledge as "rumors and hearsay." As a result, the Court finds it no more helpful to Sandidge's case than Jefferson's declaration above. *See Wells*, 474 F.2d at 839–40 (affirming trial court's exclusion on hearsay grounds testimony from a witness that several of the defendant's employees had heard that the plaintiff had been discharged for stealing); *Westfall*, 956 F. Supp. at 713 (excluding on hearsay grounds, among other things, testimony from one of the defendant's employees that she was told by another unidentified employee that the plaintiff had been discharged for "misuse of funds with a customer").

To sum up the preceding few paragraphs, Sandidge produces insufficient evidence to create a genuine issue of material fact on her claim for defamation against Fannie Mae. At bottom, "a claim for defamation is sustainable against a corporate employer for defamation by its employee only if such defamation is referable to the duty owing by the employee to the corporation, and was made while in the discharge of that duty." *Westfall*, 956 F. Supp. at 714; *see also Ehrhardt v. Elec. & Inst. Unltd. of La.*, 220 F. Supp. 2d 649, 658 (E.D. Tex. 2002). Sandidge failed to offer sufficient credible evidence that one of Fannie Mae's employees defamed her while acting within the course of his or her duty. *See Westfall*, 956 F. Supp. at 714. For that reason, Sandidge's defamation claim against Fannie Mae fails. Accordingly, the Court **GRANTS** Fannie Mae's Motion for Summary Judgment on Sandidge's defamation claim.

## IV.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Fannie Mae's Motion for Summary Judgment in its entirety. And so the Court **DISMISSES with prejudice** Sandidge's suit. Final Judgment will follow this Order.

SO ORDERED.

SIGNED: May 31, 2017.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE